**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| **TANYA WILDEN, LEGAL GUARDIAN** | )( | |
| **OF JANICE WILDEN** | )( | |
| **Et al** | )( | |
| | )( | |
| **Plaintiffs** | )( | |
| **v.** | )( | **CIVIL ACTION NO.: 3:13CV00784-H** |
| | )( | |
| **GREAT DANE LIMITED** | )( | |
| **PARTNERSHIP** | )( | |
| **Et al** | )( | |
| | )( | |
| **Defendants** | )( | |

**PLAINTIFFS' RESPONSE AND MEMORANDUM IN SUPPORT OF RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiffs file the following response to the Motion for Summary Judgment filed by Defendant, Great Dane Limited Partnership ("Great Dane") [Doc. 127].

## I. RULE 56 STANDARD

Summary Judgment is allowed only "if [Great Dane] shows that there is no genuine dispute as to any material fact and [Great Dane] is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). The court "need only consider the cited materials, but it may consider other materials in the record" and either party may file affidavits or declarations to support or oppose such motion. FED. R. CIV. P. 56 (c) and (d). "Importantly, at this stage in the litigation, we must 'view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary-judgment] motion.' *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))." *Cordell v. McKinney*, 759 F.3d 573, 579-80 (6th Cir. 2014).

## II. EVIDENCE SUBMITTED

Plaintiffs attach to this motion, and incorporate by reference, the following testimony, evidence and materials:

| EXHIBIT | DESCRIPTION |
|---|---|
| **A** | Louisville Metro Police Report |
| **B** | Officer Ronald Fey Deposition |
| **C** | Officer Clarence Beauford Deposition |
| **D** | Dr. Mariusz Ziejewski (biomechanical expert) (1) CV, (2) Report and (3) Deposition |
| **E** | Mr. Perry Ponder (accident reconstruction, underride history and trailer design expert) (1) CV, (2) Report and (3) Deposition |
| **F** | Mr. Ponder's Affidavit |
| **G** | Mr. Bruce Enz (history of underride and trailer design expert) (1) CV, (2) Report and (3) Deposition |
| **H** | Mr. James Hofstetter's Deposition (defendant's trailer design expert and Rule 30(b)(6) witness) |
| **I** | Mr. Hofstetter's Rule 30(b)(6) Deposition |
| **J** | Aerospace Research Associates (ARA) Report for U.S. Department of Transportation; *Development of Standards for Heavy Vehicle Underride Guards* (1968) |
| **K** | NHTSA Notice of Proposed Rule Making (March 19, 1969) |
| **L** | NHTSA Amended Notice of Proposed Rule Making (August 11, 1970) |
| **M** | NTSB HAR-71/04 |
| **N** | Insurance Institute for Highway Safety (IIHS) (July 30, 1975) |
| **O** | Minahan, D. & O'Day, J.; *Car-Truck Fatal Accidents in Michigan and Texas* (Univ. of Michigan - HSRI 1977) |
| **P** | William Page Patent (1977) |
| **Q** | AE PLC / Schotel Patent for Sliding/Telescoping Side Guard (1984) |
| **R** | U.S. Congress, Office of Technology Assessment; *Gearing Up for Safety: Motor Carrier Safety in a Competitive Environment* (1988) |
| **S** | CRASH response to NHTSA docket (January 1992) |
| **T** | D'Orazio side underride guard and test results (1996) |
| **U** | Strick Trailers side underride guard with sliding extension feature (1999) |
| **V** | World Report on Road Traffic Injury Prevention (WHO) (2004) |
| **W** | Brumbelow, M.; *Potential Benefits of Underride Guards in Large Truck Side Crashes*: Traf. Inj. Prev. 13:592-599 (2012) |
| **X** | Braver, E.; *Analyses of Safety Issues* (ppt.) (National Transportation Safety Board - Office of Research and Engineering) (2013). |
| **Y** | Blower, D., et al; *Heavy Vehicle Crash Data Collection and Analysis to Characterize Rear and Side Underride and Front Underride in Fatal Truck Crash*es (NHTSA 2013) |

## II. Rule 702 Motions

Pending simultaneously with this motion are the parties' Rule 702 "*Daubert*" motions. Plaintiffs proceed here, recognizing that the Court's rulings thereon may inform the court's ruling here. As the issues here overlap with those set forth in Great Dane's Rule 702 motions, plaintiffs incorporate their responses to the Rule 702 motions levied against their experts, Perry Ponder and Bruce Enz. *It should be noted that Great Dane does* ***not*** *invoke Rule 702 to challenge other parts of plaintiffs' case, including*:

(1) Defendant does not challenge the qualifications of any of plaintiffs' experts, including Mr. Ponder and Mr. Enz.

(2) Defendant does not challenge any of Mr. Ponder's accident reconstruction opinions.

(3) Defendant does not challenge any of the findings or opinions made by the investigating law enforcement officials, Clarence Beauford and Ronald Fey.[1]

(4) Defendant does not challenge any of the opinions rendered by Dr. Mariusz Zewjiewski, plaintiffs' biomechanical expert, including his opinions on (a) occupant kinematics (how the body moved), (b) injury causation (the underride caused Ms. Wilden's catastrophic brain damage) and (c) that a side underride guard as proposed by plaintiffs would have prevented nearly all of her injuries.

(5) Defendant does not challenge any of the damages evidence regarding Ms. Wilden's injuries, past medical, future life care plan or vocational losses.

For these reasons, plaintiffs' evidence regarding how the crash occurred, the manner in which Janice Wilden moved into response to that crash, and her injury causation have not been attacked.

[1] Officer Fey is a nationally certified collision reconstrucionist , having obtained a Level IV certification (highest available).

## III. Defendant's Stated Reasons for Summary Judgment

### A. Defendant Wants a Regulatory Hearing, Not a Trial

Great Dane spends nearly one-half of its page count discussing the regulatory history of the *rear* underride guard, seemingly proposing that plaintiffs need to provide regulatory guidelines for a side underride guard in order to prevail. Great Dane, to no great surprise, cites nary a case to support such a proposition. There is no federal regulation regarding side underride and even Great Dane admits there is no regulation that prohibited the inclusion of side underride protection in its trailer designs. See *Hofstetter Depo. at p. 131* (Ex. H). Indeed, Great Dane further admits that, had it included plaintiffs' safer alternative design, the trailer would have been in compliance with the Federal Motor Vehicle Safety Standards. *Id*. The plaintiffs' elements of proof are not governed by any regulatory agency nor are they governed by any agency's rule-making process; rather, they are set by the substantive law for the State of Kentucky. It is against those elements that plaintiffs' evidence must be judged.

In this connection, Great Dane nevertheless devotes a portion of its non-relevant regulatory defense to discussing a 1991 preliminary study issued by NHTSA and a single sentence buried in that near-100 page document stating that a side guard has not been determined to be cost-beneficial.[2] That one sentence had no foundation or support[3] and reliance on that one sentence is contradicted by plaintiffs' evidence, both testimonial and documentary. Leaving aside that this sentence is in the preliminary report (and not carried forward in the final report) and is admittedly not supported by any known data, it provides no basis for a summary

[2] Plaintiffs have filed a motion in limine regarding this document and incorporate it herein by reference. A regulatory analysis of what is, or is not, cost-beneficial is entirely different from a plaintiffs' burden of proof in a product liability case. Here, of course, there is no proof that any such analysis was even performed.

[3] The document itself cites no supporting data. Even defendant's retained expert (and Rule 30(b)(6) witness) agrees there is nothing to support that sentence. *Hofstetter Depo. at p. 52-53*.(Ex. 'H'). Plaintiffs further object to the statement as constituting an opinion that is thusly unreliable.

judgment. Notwithstanding the myriad of problems with Great Dane's "one sentence" defense, cost-benefit is, <u>*at best*</u>, evidentiary under Kentucky product liability law and has been contested by evidence presented by and through plaintiffs' experts. Plaintiffs have brought forth cost estimates for side underride guards from both before and after the manufacture of the 1998 trailer. Equally important, and within weeks of the 1991 preliminary report, research groups lampooned this one unsupported sentence. A filing with NHTSA by an independent research organization led by former NHTSA Administrator Joan Claybrook critiques and disproves that statement, calling it "gratuitous" and finding that "NHTSA publishes absolutely no data in support of this conclusion even though, according to its own data, the side underride death problem is measurably more serious than the rear underride problem."[4]

Time proves Administrator Claybrook right. The overwhelming benefits of side underride protection dominate the scientific and engineering literature. The World Health Organization stated that "the benefits [of side underride protection] would exceed the costs, even if the safety effect of these measures was as low as 5%."[5] That study also estimated that side underride protection would provide a safety benefit of 40-50%.[6] A NHTSA-sponsored study by one of UMTRI's leading researchers[7] determined that "side underride [is] a significant problem in serious crashes between heavy trucks and light vehicles."[8] Similarly, the senior research engineer at Insurance Institute for Highway Safety (IIHS)[9] determined that a side underride

---

[4] *CRASH Response to NHTSA docket* (Ex. 'Q').
[5] *World Report on Road Traffic Injury Prevention at p. 124* (World Health Organization 2004) (Ex. 'R').
[6] *Id*. at p. 84.
[7] UMTRI is the acronym for University of Michigan Transportation Research Institute. Great Dane's own expert concedes UMTRI is a well known and reliable organization as far as its research and work in automotive safety. *Hofstetter Depo. at p. 43-44* (Ex. H).
[8] Blower, D., et al; *Heavy Vehicle Crash Data Collection and Analysis to Characterize Rear and Side Underride and Front Underride in Fatal Truck Crashes at pp. viii; 83* (NHTSA 2013) (Ex. 'Y').
[9] Great Dane's own expert concedes that IIHS is "highly regarded" on transportation safety issues. *Hofstetter Depo. at p. 108* (Ex. H).

guard (specifically identified one of the designs fabricated and tested by plaintiffs' experts in this case) would reduce the risk in 75% of the side impacts where an injury of AIS-3 or higher occurred.[10] The National Transportation Safety Board (an independent U.S. governmental agency) has favorably cited the work by plaintiffs' experts in developing side underride protection.[11] Clearly, the issue of cost-benefit is not as definitive as Great Dane implies in one sentence from twenty-five years ago.[12]

## B. GREAT DANE'S STATED "THREE REASONS"

Great Dane's motion lists but three reasons that entitles them to summary judgment, none of which can withstand scrutiny:[13]

### (1) There is no evidence that the safer alternative design physically existed in 1998

Kentucky product liability law does not require that a safer alternative design physically existed at the time of the product's manufacture; instead, the test is whether the safer alternative design was practical (or feasible) in 1998. Both the depositions and reports from plaintiffs' experts (Mr. Ponder and Mr. Enz)[14] demonstrate the alternative design's technological feasibility thereby rendering this reason non-meritorious. Stated otherwise, the design(s) brought forward

---

[10] Brumbelow, M.; *Potential Benefits of Underride Guards in Large Truck Side Crashes*: Traf. Inj. Prev. 13:592-599 (2012) (Ex. 'W').

[11] Braver, E.; *Analyses of Safety Issues* (National Transportation Safety Board - Office of Research and Engineering) (2013). See Ex. 'X'.

[12] On the cost side, and beyond those made over the past decade by Mr. Ponder and Mr. Enz, multiple other cost estimates have been made for side underride protection. See e.g. U.S. Congress, Office of Technology Assessment; *Gearing Up for Safety: Motor Carrier Safety in a Competitive Environment* (1988) (Ex. 'R'); D'Orazio side underride guard and test result (including cost estimates) (1996) (Ex. 'T'); Strick Trailers side underride guard with sliding extension feature (1999) (Ex. 'U').

[13] See *Memorandum in Support of Great Dane Limited Partnership's Motion for Summary Judgment* [Doc. 127-1] at p. 2.

[14] *Ponder Depo. at p. 25; 175-76; 177* (Ex. D); See generally Ex. 'D', 'E', 'F' and 'G'.

here were feasible by use of then-existing materials, design ability and well-established scientific/engineering principles.[15]

(2) Whether Janice Wilden would have been injured if the alternative design had been in use

This 'reason' is not fully briefed or discussed throughout Great Dane's entire memorandum.[16] Mr. Ponder is clear that, had the alternative design been in place, there would have been no passenger compartment intrusion.[17] Dr. Ziejewski's (plaintiffs' *unchallenged* biomechanical expert) is equally clear that, had the alternative design been in place, Janice Wilden would have suffered no more than AIS-1 injuries (the least severe category of injury);[18] instead, she suffered a devastating head and brain injury from the underride.[19]

(3) What Janice Wilden's enhanced injuries would have been without the alternative design

Dr. Ziejewski also addressed this point. When Janice Wilden underrode the unprotected side of the Great Dane trailer, her vehicle sustained severe passenger compartment intrusion. The trailer's side rail crushed and pushed the vehicle roof into her head, causing Ms. Wilden's catastrophic brain injury. Had her vehicle not underrode this trailer, Dr. Ziejewski is clear that her injuries would have been minimal (AIS-1). This argument is likewise without merit.[20]

---

[15] *Id*.
[16] At most, Great Dane's position on this point is mentioned in a conclusory fashion at p. 25 of its Memorandum.
[17] *Ponder Depo. at p. 204-05*; *Ponder Report at p. 13-14* (Ex. 'E').
[18] See *Dr. Ziejewski Depo. at p. 43*; *Dr. Ziewjewski Report at p. 16, opinions 5-7* (Ex. 'D'*).*
[19] Dr. Ziejewski found that, without side underride protection, her injuries were AIS-4/AIS 5. *Id*. AIS stands for the Abbreviated Injury Scale is the widely-used scale for coding injury severity. It codes injuries from 1 to 6 (1 is the least and 6 is fatal). It is the result of the joint efforts of the American Medical Association, Society of Automotive Engineers and Association for the Advancement of Automotive Medicine. See www.aaam.org.
[20] *Dr. Ziejewski Depo. at p. 55-57; 114-15*; *Dr. Ziejewski Report at p. 16, opinions 1; 4* (Ex. 'D').

## IV. UNDERLYING FACTS

### A. DEFENDANT'S RECITATION OF FACTS AND CIRCUMSTANCES IS REJECTED

Defendant's motion contains Great Dane's impermissibly argumentative "view" or "opinions" of certain facts or circumstances, many of which contain no citation or reference to record.[21] Due to both inaccuracy and a lack of record citation, plaintiffs object to it. To the extent it invites the court to fail to exercise its duty to "view the facts and draw reasonable inferences in the light most favorable" to plaintiffs, plaintiffs further object.

### B. THE ACCIDENT

On June 24, 2013, an 18-wheeler being driven by Dwight Weisner drove through a stop sign and in front on an oncoming 1995 Lumina being driven by Janice Wilden. Ms. Wilden was properly belted and her infant son was properly restrained in the rear. *Louisville Metro Police Report* (Ex. 'A'). In an effort to avoid the 18-wheeler, Janice Wilden applied her brakes and took further evasive action,[22] but was unable to avoid the trailer. The right front edge of her Chevrolet Lumina struck the front-most left rear tandem tire while the remainder of the Lumina went underneath the open and unprotected side of the Great Dane box van trailer. The Lumina was then drug across the roadway by the 18-wheeler.

---

[21] Great Dane cites to the record only to "prove up" a diagram of the 1998 trailer and to show that Mr. Ponder's design was not in physical existence in 1998.

[22] See police diagram in *Louisville Metro Police Report* (Ex. 'A'). Officer Fey Depo. at p. 25; 116 (Ex. 'B').




As the Lumina underrode the trailer, the trailer's side rail ripped through the vehicle's roof and windshield causing the massive brain injuries at stake here.[23]




This crash is called an underride crash.[24]

---

[23] Mr. Ponder's accident reconstruction has not been subjected to a Rule 702 challenge. See also *Dr. Ziewjewski Report at p. 16, opinions 1-7* (Ex. 'D').

### C. UNDERRIDE CRASHES ARE DEADLY AND DANGEROUS EVENTS AND GREAT DANE KNEW OF THOSE DANGERS LONG BEFORE OUR TRAILER WAS MANUFACTURED

Simple geometry demonstrates the mismatch between a passenger vehicle and a box van trailer. In such a crash, the front of the vehicle goes beneath the trailer rendering most (if not all) of the vehicle's protective devices in a frontal impact inoperable. It places the brunt of the impact on the unprotected space where the occupant's head and upper torso lies. It has been called the "guillotine effect." No one disputes that such crashes are dangerous and no one disputes that these dangers have been known for decades. While statisticians and researchers may debate how many people have been killed and how many people have been catastrophically injured, the fact remains: an underride crash kills and maims. Great Dane was well aware that side underride crashes like this one are dangerous events. *Hofstetter Depo. at p. 132-33* (Ex. 'H'). Moreover, Great Dane knew of these dangers long before 1998. *Id. at p. 200-01*. Great Dane, as a corporation, was so aware. *Hofstetter Rule 30(b)(6) Depo. at p. 59* (Ex. 'I') (Great Dane knew of dangers of side underride as long ago as "at least the early 1960s"). Despite this, Great Dane took no action to reduce, eliminate or solve these dangers. *Id*. at p. 93.

## IV. SIDE UNDERRIDE

Plaintiffs bring to this case evidence from many sources to support its theories of liability. First, plaintiffs bring the history of side underride protection (or lack thereof) to bear. This is a history that, in this country, stretches back more than 50 years. Second, plaintiffs bring a wealth of evidence regarding side underride protection including designs from government-sponsored studies, contractors, engineers, trailer industry engineers, and industry "insiders". Third, plaintiffs bring designs already designed, built and tested that prevent or minimize the

---

[24] Photograph from Louisville Metro Police Department file. See also *Deposition of Officer Beauford at p.50* (Ex. 'C').

dangers of side underride and the resulting passenger compartment intrusion. Fourth, plaintiffs bring designs that provide complete protection alongside the entire side of the trailer, regardless of what position the rear tandem tires may be in. Fifth, plaintiffs bring proof that certain of these designs have been "real world" and "road tested" to rebut the unsupported claims by Great Dane these design(s) "don't work in the real world". Lastly, the plaintiffs' evidence demonstrates that these safer alternative designs were available and practical to defendant well before the subject 1998 Great Dane trailer was made. In all respects, plaintiffs' evidence demonstrates that feasible, safer alternative designs, was capable of being developed and implemented prior to 1998, were practical. This evidence further demonstrates that the subject trailer was unreasonably dangerous.[25]

### A. INDUSTRY IS TOLD TO INCORPORATE SIDE UNDERRIDE PROTECTION INTO ITS DESIGNS YET GREAT DANE, ET AL DOES NOTHING

In December 1968, Aerospace Research Associates (ARA) concluded a three month study for the U.S. government that established the need and basis for design, fabrication and crash testing of both side & rear guards, noting that "*It would appear that equipping such heavy vehicles with rear and side underride guards would result in a reduction of a number of fatalities and the severity of injuries.*" Although ignored by Great Dane and others in the industry, others point to this report as providing the "blue print" for a side underride guard (SURG).[26] Three months later (March 1969), the U.S. Department of Transportation specifically noted that it was anticipated that the standard would be amended to include side underride protection.[27] The following year (August 1970), the government expressed its desire that trailer manufacturers

[25] Again, Great Dane does not attack via summary judgment whether the trailer was unreasonably dangerous.
[26] This NHTSA-sponsored report is Ex. 'J' and comprises some 127 pages including detailed engineering drawings for a side underride guard.
[27] Ex. 'K'.

would "on their own" include side underride protection in their designs.[28] In 1971, the National Transportation Safety Board ("an independent United States Federal Government Agency" that is "charged with ... promoting transportation safety"[29]) recommended side underride protection[30] followed by a similar call in 1975 from the Insurance Institute for Highway Safety (IIHS).[31] As of today (nearly one-half century later), Great Dane, by its own admission, still has ***done nothing*** to develop any form of side underride protection. *Hofstetter Rule 30(b)(6) Depo. at p.64; 93* (Ex. I).

## B. More Designs for Side Underride Protection Come Forward

In addition to the 1968 ARA report, other designs for a SURG began appearing. Multiple patents and designs were developed; however, Great Dane embraced none of them.[32] Example included a 1977 design by William Page ("Page Patent").[33] In 1995, a side underride guard that was designed and built by Mr. Pete D'Orazio, the one-time Chief Trailer Engineer for Budd Trailers. This design was crash tested in 1996 with instrumented crash data obtained. Economic costs for this guard were also calculated.[34] These designs became the forerunners to the 2004 (and forward) designs from Enz, Ponder and others.[35] It, too, became a model for other designs. Most importantly, these guards form a portion of the evidence that demonstrates the technological feasibility and practicality of side underride protection prior to 1998.

---

[28] Ex. 'L'.
[29] www.ntsb.gov.
[30] Ex. 'M'.
[31] Ex. 'N'. ("Trailer designs should prevent rear and side underride by cars"). Even Great Dane *and* its retained experts concede that the IIHS is one of the best and most-respected private safety and research organizations in the country. *Hofstetter Depo. at p. 108* (Ex. H) (recognizing IIHS as "highly regarded").
[32] Certain of the patents and designs pre-existed the subject 1998 trailer. Others post-date it; however, many of those were (per expert analysis) technologically practical, or feasible, prior to 1998.
[33] William Page Patent (1977) (Ex. 'P').
[34] See Ex. 'T'.
[35] Besides design and input from both Mr. Enz and Mr. Ponder (both retained experts in this case), others had input including Mr. John Tomassoni (now deceased and described by a Great Dane expert as "the" underride engineer at NHTSA), Dr. Anthony Sances (also deceased), and Dr. Angelo Trego (a Ph.D. engineer).

### C. DESIGN IN THIS CASE

#### 1. Great Dane does not contest "generic" side underride protection

Great Dane's motion does not attack the feasibility of side underride protection in general for one simple reason: the evidence is overwhelming against it. Following the work done by Page, D'Orazio, et al, Mr. Enz and others[36] designed a series of underride guards that have been built, crash tested, subjected to stress and durability testing, and used on 'real world' over-the-road trailers. These designs have been the subject of peer-reviewed articles and cited favorably in other peer-reviewed literature[37] as well as by governmental agencies.[38] Mr. Ponder has also developed an integrated design that incorporates an aerodynamic fairing with an underride guard. *Ponder Depo. at p. 25* (Ex. 'E').[39] These were all capable (or feasible) of being implemented prior to 1998.

#### 2. Great Dane's attack on protection for the rear "gap" is equally unavailing

Great Dane is content to mount a very limited attack predicated on the need for side underride protection for the "gap" that is created when the rear tandem tires are slid 'back' into their rear-most position. As with side guards in general, multiple designs for this issue have been brought forth in this case that were practical in or prior to 1998 by the application of well-known and accepted engineering principles and methods by use of a sliding, or telescoping, extension of the underride guard.

---

[36] Great Dane admits that plaintiffs' expert, Mr. Enz, has performed more side underride testing than anyone. *Hofstetter Depo. at p. 212*.

[37] See, e.g., Ex. 'W'.

[38] See, e.g., Ex. 'X'.

[39] Mr. Ponder's integrated design (called "Angel Wings") was developed outside of litigation as a separate venture. It has been recognized and awarded a grant by the National Academy of Sciences.

This concept of sliding or "telescoping" devices is neither new nor novel. It has existed for hundreds of years and has been used in a multitude of engineering design.[40] The 1977 Page design from incorporates a sliding concept in its side guard.[41] A 1984 side guard design is such that the guard's rails interact "telescopically so that the overall length of the guard can be adjusted".[42] In 1999, a competitor of Great Dane (Strick Trailer) designed and cost-estimated a design that incorporated a sliding guard.[43] Mr. Enz' own patent application for his side underride guard included a telescoping extension. *Enz Depo. at p. 203-05 (Ex. 'G').* Mr. Ponder's non-litigation design (Angel Wings) can make use of this concept. *Ponder Depo. at p. 25* (Ex. 'E'). Mr. Ponder has also designed, using conventional and time-tested engineering principles, a sliding guard that (1) uses pre-1998 engineering design principles and (2) has been tested and validated using reliable and accepted testing methodology. From our evidence, these designs have been determined to (a) be feasible, practical and capable of being incorporated into the 1998 Great Dane trailer and (b) capable of preventing the underride and resulting passenger compartment intrusion. *Ponder Depo. at p. 175-76* (Ex. 'E'). See also *Ponder Affidavit* (Ex. 'F').

### D. <u>TECHONOLOGICAL FEASIBILITY/PRACTICALITY</u>

Kentucky law generally requires that a plaintiff must show a safer, and feasible (or practical), alternative design. *Toyota Motor Co. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004). Plaintiffs have come forward with expert testimonial and documentary evidence that raises the requisite fact issue. Defendant persists in the unsupported position that the safer alternative design must be built and in use circa 1998. That argument misses the mark for several reasons.

---

[40] See *Ponder Affidavit* (Ex. 'F').
[41] Exhibit 'P'. Plaintiffs recognize that the sliding concept in Page's design was to raise or lower the bar; however, the concept is similar.
[42] Ex. 'Q'.
[43] Ex. 'U'.

**1. Great Dane simply restates its Rule 702 argument**

In large part, Great Dane's argument is nothing more than its partial Rule 702/*Daubert* attacks on Mr. Ponder and Mr. Enz: (1) the design has was not in existence in 1998, (2) it has not been built and (3) it has not been tested in the manner in which Great Dane (incorrectly) believes it should be tested. To the extent Great Dane's arguments here simply retread its other motions, plaintiffs incorporate their own responses thereto.

**2. Building a Prototype is not required - but Plaintiffs developed one**

The Sixth Circuit follows the large, if not unanimous, number of courts that do not require an expert to build a prototype of its alternative design. See e.g. *Johnson v. Matitowoc Boom Trucks, Inc.*, 484 F.3d 426, 433 (6th Cir. 2007)[44] citing *Martin v. Michelin North America, Inc.*, 92 F. Supp. 2d 745 (E.D. Tenn. 2000). See also RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. SEC. 2, CMT. f (1998). *Martin* held that "The plaintiff is *not required to produce a prototype design in order to make out a prime facie case*." 92 F. Supp. 2d at 753. Others are in accord. See e.g. *Brochtrup v. Mercury Marine*, 426 Fed. Appx. 335 (5th Cir. 2011) ("Plaintiff was *not required to build and test a prototype of the alterative design to show technological feasibility*, but was merely required to prove that the alternative design was 'capable of being developed.'"[45] *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1012 (8th Cir. 2005) ("Our cases *do not require that experts manufacture a new device or prototype in order for their opinion to be admitted*.") These views are entirely consistent with the Restatement's position that:

> "[Q]ualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale.

---

[44] *Johnson*, after stating that neither building nor testing were required, did hold that a 1-page drawing and no testing was insufficient. Here, plaintiffs do not suffer from such lackluster evidence.

[45] The 5th Circuit's use of 'capable of being developed' language is virtually *verbatim* to Kentucky's requirements.

RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. SEC. 2, CMT. f (1998). See e.g. *Gidding & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011) (discussing and following RESTATEMENT (THIRD) OF TORTS); Larkin v. Pfizer, Inc., 158 S.W.3d 758 (Ky. 2004) (adopting RESTATEMENT (THIRD) OF TORTS: PROD. LIAB.'S learned intermediary doctrine); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798 (W.D. Ky. 2000) (predicting Kentucky will adopt RESTATEMENT (THIRD) OF TORTS).

Even so, plaintiffs have brought forth prototype evidence including voluminous evidence of side underride guards that existed both before and after 1998. Those include designs that were feasible, or practical, prior to 1998 even though they are post-1998 guards. Plaintiffs have cited a design drawn nearly two decades ago by one of Great Dane's own competitors that specifically addressed the tandem "gap" issue. Mr. Ponder has also designed a prototype with a sliding, or telescoping, piece that addresses this gap. In so doing, he utilized a highly-regarded design methodology called SolidWorks, a 3-dimensional computer-aided design and engineering program that has widespread use by engineers and industry.[46] Even Great Dane uses, and encourages the use of, SolidWorks in its own engineering department. See, e.g., http://ww2.greatdanetrailers.com/corporate/careers/CoopResponsibilities.asp. Among its many disingenuous positions, Great Dane's argument that use of programs such as SolidWorks for design purposes is disproven by its own conduct.

[46] SolidWorks "is a world leader in 3D solutions that help millions of engineers and designers succeed through innovation. Our products deliver an intuitive experience in product design, simulation, publishing, data management, and environmental impact assessment." Nearly 2,000,000 engineers use SolidWorks as does more than 165,000 companies. https://www.solidworks.com/sw/docs/Corp_FactSheet_2012Q2.pdf. It serves, among others, the automotive and transportation industry. *Id*.

**3. Testing not Required - but Plaintiffs have tested**

Great Dane next argues that testing is a "litmus test" for a safer alternative design; however, this misstates both the applicable law and underlying facts. In *Clark v. Chrysler Corp.*, 310 F.3d 461, 467-68; 470 (6th Cir. 2002), the lack of specific testing did not prove fatal when the expert had prior experience with similar testing.[47] Here, plaintiffs' experts have extensive experience in such testing. Both Mr. Ponder and Mr. Enz have formulated, conducted, participated in and reviewed (in and outside of litigation) crash testing for various underride guards. This provides a wealth of knowledge regarding the effectiveness of such guards, their dynamics and how they protect the occupants from passenger compartment intrusion. Mr. Ponder's own private sector employment requires him to test, validate and certify multiple designs including underride guards.[48] Mr. Ponder and Mr. Enz have been published in the peer-reviewed literature on these topics and had their work cited by independent researchers, other peer-reviewed literature, the U.S. Department of Transportation and the National Transportation Safety Board.

Mr. Ponder has also performed testing to verify the effectiveness of his design in a wide-range of collisions, including ours. This testing has taken the form of both computer-aided testing and finite element analysis (FEA). The peer-reviewed literature has used this method to test and validate underride designs.[49] These methods are so reliable and widely-used that even Great Dane used them to validate its own European side guard: "Bill White did an FEA model and we feel we have an acceptable design." See *Great Dane Production at EU2062* (1997).

---

[47] See also *Palatka v. Savage Arms, Inc.*, 535 Fed. Appx. 448, 455-56 (6th Cir. 2013) (exclusion of expert for lack of testing reversed).

[48] Mr. Ponder is employed by a trailer company as the design certifying engineer for *inter alia* underride guards.

[49] See e.g. Morodi, R., et al; *Influence of Truck Under-ride Side Guard* (Wichita State 2011); Moriali, J., et al; *Design and Test of Articulated Guard Able to Prevent Underride*; SAE 973106 (1997).

Again, this demonstrates Great Dane's "sleight of hand" - it argues the unreliability of a method that it is has used and relied upon for *at least* two decades.

Use of these methods in lieu of other forms of testing have been long-accepted under *Daubert*. See *MacKenzie v. JLG Indus.*, 2014 U.S. Dist. LEXIS 177545 (W.D. Ky. 2014) (Russell, J.) ("The Court agrees that physical testing is not required, especially as Webster physically observed the evidence and has tested his theories through computer simulations."). See also *Crouch v. John Jewell Aircraft, Inc.*, 2016 U.S. Dist. 3528 (W.D. Ky. 2016) (Lindsay, J.). Finite Element Analysis, as employed here, also enjoys the support of the Federal Judicial Center and National Academies of Science. See *Reference Manual on Scientific Evidence* (National Academies Press 3rd. ed. 2011).[50]

The alternative design in this case has undergone this type of validation and testing (and more) by Mr. Ponder. He also brought to bear vast experience, observation and comparative analysis along with his substantial testing experience. This is further buttressed by the design and test work done by Mr. Enz. See Ex. 'G'.

**4. <u>Great Dane then invokes the "nobody did it" defense</u>**

Great Dane retreats to argue that, since no one else in the industry did it, then they are summarily excused for having likewise done nothing at all to correct or solve the side underride tragedy. This argument can most generously be cast as a warping of the presumption found in KRS 411.310 (b).[51] The presumption disappears once a plaintiff brings forth evidence of a defect. Indeed, the jury is not even instructed on such. *Clark v. Chrysler Corp.*, 310 F.3d 461,

---

[50] http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf.

[51] "It shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured."

475-76 (6th Cir. 2002). See also *Ky. Farm Bureau Mut. Ins. Co. v. Broan-Nutone, LLC,* 2013 U.S. Dist. LEXIS 151241 (W.D. Ky. 2013); *Boon Edan, Inc. v. Saunders*, 324 S.W.3d 422, 431-32 (Ky. App. 2010).

Moreover, Kentucky rejects defendant's theory as a matter of sound policy and safety. "[I]f an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standards." *Logsdon v. Cardinal Indus. Insulation Co.*, 2006 Ky. App. 664 (Ky. App. 2006) citing *Owens-Corning Fiberglass Corp. v. Golightly*, 976 S.W.2d 409, 411 (Ky. 1998) ("We agree that if an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standard. *Herme v. Tway*, 294 S.W.2d 534 (Ky. 1956). If the only test is to be that which has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety."). The circumstance that the trailer industry conspired to ignore the side underride issue provides Great Dane no relief, either in fact or under the law. That is why technological feasibility (or what *could have* been done) fixes liability.

Mr. Ponder's own non-litigation design (called "Angel Wings") was technologically feasible in 1998 and can practically include the sliding extension feature. *Ponder Depo. at p. 25* (Ex. 'E'). Further, plaintiffs have produced the 1999 Strick Trailers' design that calls for a side underride guard with an extension designed to cover the exposed area created when the rear tandems are in the rearmost position.[52] That design, by application of then-existing and established design and engineering principles, was technologically feasible long before 1998.[53] See *Ponder Depo. at p. 177* (Ex. 'E'); See also *Enz Report at p. 18* (Ex. 'G'). Mr. Ponder also developed a design that would close that 'gap' and that design was, likewise, technologically

[52] Ex. 'U'.
[53] *Ponder Report opinion no. 1*5 (Ex. 'E').

feasible on and before 1998. *Id*. at p. 175-76. The Strick design was tested and vetted by the manufacturer,[54] and Mr. Ponder subjected his design to multiple testing procedures. See *Ponder Depo. at pp. 156-57; 160-61; 166; 260; 261; 281* (Ex. 'E'). Plaintiffs have brought forth more than sufficient evidence of a then-feasible and safer alternative design.

**E. Economic feasibility**

Great Dane does not address the economic feasibility or cost concerns; however, there is more than ample evidence here.[55] Mr. Ponder cost-estimated his design at approximately $600. *Ponder Depo. at p. 301; see also Ponder Depo. at Ex. 11* (Ex. 'E'). The Strick Trailer design was much less ($329). See Ex. 'U'. There is also costing information for the D'Orazio guard (1996) (Ex. 'T') and the U.S. government (1988) (Ex. 'R'). Defendant argues that these costs are not using "1998 dollars"; however, the analysis does use cost information both before and after that date. A jury can take this direct evidence and draw reasonable inferences as to the economic feasibility or cost of this safety device.

**F. These designs would have made a difference**

The dangers of side underride are obvious and well-established: the vehicle goes beneath the trailer, causing the side rail to "destroy" the unprotected windshield area. This causes forcible passenger compartment intrusion subjecting the occupants to death or, as here, significant head trauma. Mr. Ponder's unchallenged reconstruction finds that (had the safer alternative design(s) been in place) the guard would have captured the vehicle and prevented the underride and resulting passenger compartment intrusion. *Ponder Depo. at p. 204-05* (Ex. 'E'); *Enz Report at p. 18* (Ex. 'G'). It is unchallenged that Ms. Wilden's vehicle would be expected to

[54] Ponder Depo. at p. 182-84 (Ex. 'E').

[55] Kentucky substantive law has not addressed this as an element of a product liability case in any meaningful way. While it may be subsumed by the technological feasibility issue, or not be a factor at all, plaintiffs nevertheless discuss it.

provide top tier protection in the event of a crash such as this had a side guard been provided. NHTSA's own NCAP program gave the 1995 Chevrolet Lumina its highest rating - 5 stars.[56] Likewise, the more severe crash testing by the Insurance Institute for Highway Safety (IIHS) provided similar results.[57]

By not having such a system in place, it is Dr. Ziejewski's unchallenged opinion that the underride and following passenger compartment intrusion produced Janice Wilden's catastrophic brain injuries. See *Dr. Ziejewski Deposition at p. 85*; See also *Dr. Ziejewski Report at opinion nos. 1; 3; 4* (Ex. 'D'). To close out the inquiry, Dr. Ziejewski further found that, had such a system been in place, Ms. Wilden's injuries would have been minimal. See *Dr. Ziejewski Deposition at p. 115* ("so but for the intrusion, we are just fine"). See also *Dr. Ziejewski Report at opinion nos. 6; 7*. This more than adequately supports the crashworthiness element of enhanced injury.

## IV. A FINAL REJOINDER

Defendant closes its motion with a multi-topic diatribe that, on its best days, would be better suited for jury argument. Nevertheless, plaintiffs reply.

First, Great Dane buries its claim that the side guard extension does not 'fit'. This reflects a misunderstanding of the basic workings of Mr. Ponder's computer-aided design and engineering. This is refuted by Mr. Ponder's affidavit. Ex. 'F'.

Whether any other manufacturer did, or did not, use plaintiffs' design in 1998 does not frame the issue. The issue is whether plaintiffs' proposed safer alternative design was

[56] NCAP stands for NHTSA's New Car Assessment Program and includes a 30 mph frontal impact resulting in injury criteria from instrumented crash dummies.
[57] IIHS performs 35 mph offset front impact testing, also with instrumented crash dummies. Both sides here recognize the reliability and authoritativeness of IIHS.

technologically feasible in 1998. Plaintiffs have two qualified experts who have done the work in a side underride context who answer that question affirmatively. Moreover, and despite defendant's claim that the design is just "a wistful concept", plaintiffs have produced detailed documentation from a rival manufacturer who designed a similar concept some 16 years prior. Both that design, and plaintiffs' design, have been tested by multiple reliable and well-accepted methodologies to determine their suitability and safety in a crash situation. Plaintiffs also have durability and stress testing that applies and transfers to their design.

Defendants claim "so much is unknown" but that is (a) untrue and (b) marginally relevant, if at all. The dangers of side underride crashes have been known to the trailer manufacturers like Great Dane for at least one-half of a century. Government and independent research provided this information as to the deaths, injuries and types of impacts these side underrides cause. The 1977 study published by what is now UMTRI found 195 people were killed each year from side underride.[58] Moreover, there is no requirement (under Kentucky law or elsewhere) that plaintiffs' safer alternative design protect all people for all time. Plaintiffs have brought forth strong and sufficient evidence under a Kentucky crashworthiness standard. Such being the case, summary judgment is improper.

[58] And this number is low due to the undercount recognized in the government statistics. See e.g. Braver, E., et al; *Incidence of Large Truck-Passenger Car Underride Crashes in Fatal Accident Reporting System and National Accident Sampling System* (1995); Brumbelow, supra (Ex. 'W'). Blower, et al, supra (Ex. 'Y').

Respectfully submitted,

**THE FERGUSON LAW FIRM, LLP**
350 Pine Street, Suite 1440
Beaumont, Texas 77701
(409) 832-9700 phone
(409) 832-9708 fax

By: s/ *Paul F. "Chip" Ferguson, Jr.*
**PAUL F. (CHIP) FERGUSON, JR.**
cferguson@thefergusonlawfirm.com
Texas Bar No. 06919200
**RYAN M. SCHAPER**
rschaper@thefergusonlawfirm.com
Texas Bar No. 24068814

**RONALD P. HILLERICH**
1800 Kentucky Home Life Building
239 South Fifth Street
Louisville, Kentucky 40202
(502) 736-8100

**ALLEN K. GRUNER**
300 W. Liberty Street, Suite Three
Louisville, Kentucky 40202-3040

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel on this 29th day of February, 2016 in accordance with Fed.R.Civ.P.

By: s/ *Paul F. "Chip" Ferguson, Jr.*
**PAUL F. (CHIP) FERGUSON, JR.**