**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**TANYA WILDEN, ET AL. ,**

**Plaintiffs**

**v.**

**LAURY TRANSPORTATION, LLC,**

**ET AL.,**

**Defendants.**

**CIVIL ACTION NO. 3:13CV-00784-H**

**GREAT DANE LIMITED PARTNERSHIP'S REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

In response to Great Dane's motion for summary judgment, plaintiffs submit hundreds of pages of deposition testimony, reports and other documents, including some not previously disclosed in discovery, but specific citations to *admissible* evidence are few, and none of those citations creates an issue of fact that is *material* to the grounds set forth in Great Dane's motion for summary judgment. The result is a scattershot response that distracts but does not prove the essential elements of plaintiffs' claim—*i.e.*, that a "telescoping" side guard design existed in 1998 that was practical and that would have provided a net benefit considering the full range of possible side-impact collisions and, specifically, some identifiable, measurable differences in the outcome of the plaintiffs' collision. As a result, it is still an undisputed fact that no "telescoping" side guard has ever been built, much less tested at the angle and speed at which the plaintiffs contend their accident occurred. The "schematics" of plaintiffs' proposed guard designs do not even provide

the information needed to enable a trailer manufacturer to build or attach one of those guards to a trailer. They are at most mere concepts and are not supported by opinion testimony that is based on reliable scientific data and methodology. Without this evidence, plaintiffs' claims must fail as a matter of law.

## ARGUMENT AND CITATIONS OF AUTHORITY

It is important to note that, in response to Great Dane's motion, the burden of putting forth specific evidence to prove the elements of their claim rests on the plaintiffs, and so their numerous arguments that Great Dane "does not challenge" or "does not attack" or "does not contest" a particular aspect of their claims are entirely misdirected.[1] It is not Great Dane's burden to *disprove* plaintiffs' claims. The relevant inquiry is whether plaintiffs have admissible proof of product defect, causation, and enhanced injury. On these issues, they rely solely on their purported experts' conclusory opinions and the hearsay documents attached to their response. Great Dane has separately filed motions *in limine* to exclude these consultants' opinions because they are not based on reliable scientific data and methodology and, in important respects, they were not fully and properly disclosed in discovery. Without that opinion testimony, the plaintiffs completely lack the proof needed to avoid summary judgment.

### A. Regulatory history.

Plaintiffs completely misconstrue the importance of the regulatory history of efforts by the U. S. Department of Transportation to address trailer underride.

[1] Great Dane most certainly challenges, for example, the accident reconstruction by plaintiffs' consultant, Perry Ponder, and the occupant kinematics and injury causation analysis by Mariusz Ziejewski, and Great Dane has designated experts who have produced differing opinions. But these differences are not material to the present motion.

Great Dane does not assert a "regulatory defense" or argue that plaintiffs must prove the existence of "regulatory guidelines for a side underride guard" in order to prevail in this lawsuit; nor does Great Dane contend that plaintiffs' elements of proof are "governed by any regulatory agency [or] … rulemaking process." [Doc. #162, p.4]. Instead, Great Dane submits the regulatory history in order to demonstrate the many challenges to developing technologically and economically feasible criteria for building guards on trailers that will, within the full universe of possible side-impact collisions, provide a net benefit.

Designing a guard for a single accident, calculating the costs of that guard, and claiming to have analyzed its effect in that single accident (as plaintiffs' consultants have attempted from lawsuit to lawsuit, making modifications and adding features unique to each case) will not prove a feasible alternative design. The regulatory history instead shows the need to design for the many different types of accidents involving different vehicle shapes and sizes, vehicle weights, vehicle speeds, angles of approach, occupant positions and seat belt use, and trailer configurations. The regulatory history further shows that consideration of guard strength alone is not enough, since increases in deceleration forces and/or sudden contact with a vehicle's interior components can be as injurious as passenger compartment intrusion by the trailer. Plaintiffs' theory of alternative design and injury causation rests entirely on the assumption that if there is no passenger compartment intrusion, there will be no serious injury; but, this concept is neither self-proving nor true. The court cannot *presume* the effectiveness of a side guard

based on untested and unproven opinion testimony as to the lack of passenger compartment intrusion in a single hypothetical accident. Likewise, a jury cannot base a finding on mere conceptual drawings or on evidence that shows only a *possibility* of benefit. If anything, the regulatory history shows the importance of considering all accident types, all costs and benefits, and actually building and testing the guard designs (which plaintiffs' experts have recognized and have undertaken in other lawsuits, but not for the "telescoping" guard ideas proffered in this case). [2]

**B. Economic feasibility.**

Plaintiffs' responses to specific aspects of the regulatory history nevertheless warrant attention, if only because they are incomplete or contain incorrect statements about what actually is stated in the materials plaintiffs have cited. These materials do not prove economic feasibility and, therefore, cannot support opinion testimony by the plaintiffs' Rule 26 witnesses, Perry Ponder and Bruce Enz.

First, plaintiffs assert that NHTSA's determination in its 1991 Preliminary Regulatory Evaluation ("PRE") that side guards were not cost-effective[3], had "no foundation or support," and "there is no proof that any such analysis was even performed." [Doc. #162, p.4]. This is not true. Great Dane's expert witness, James

---

[2] Bruce Enz testified at length to what he believes are the necessary steps that a prudent trailer engineer needs to follow to develop a feasible side guard design, but neither Enz nor Ponder has actually completed those steps with respect to the guard concepts they propose to testify about in this case. [Enz Dep. pp 53-82, 149-150.]

[3] Plaintiffs misrepresent the 1991 PRE as stating "that a side guard *has not been determined to be* cost-beneficial." [Doc. #162, p.4 (emphasis added)]. In fact, NHTSA affirmatively stated that such guards "have been determined not to be cost-effective." NHTSA made no other assessment of the economic feasibility of side guards before Great Dane sold the trailer at issue in this lawsuit in 1998, or since.

Simons, who worked at NHTSA in 1991 and actually made this determination, has produced a report that documents the analysis he performed. [Doc. #155-4]. This is no "one-sentence defense" [Doc. #162, p.5], but more importantly it is not Great Dane's burden to prove *any defense* on the pending motion for summary judgment. It is *plaintiffs'* burden to prove that a "practical" guard existed in 1998, and economic feasibility is a component of that proof.

Plaintiffs cite in footnotes a variety of sources regarding the cost of various side guard concepts and the purported benefits that plaintiffs claim might be achieved, but a close reading of the cited sources exposes the inadequacy of this hearsay evidence. For example, the undated CRASH document cited in Footnote 4 does not "disprove" NHTSA's determination that side guards are not cost-beneficial, as plaintiffs represent. [Doc.# 162, p.5]. More importantly, it contains nothing that proves side guards *are* cost-beneficial. Similarly, the 2004 WHO document cited in Footnotes 5 and 6 (but not in the Ponder or Enz reports) does not, as plaintiffs represent, state that the benefits of side guards "would" exceed the costs. [Doc.# 162, p.5]. The document states: "It has … been *suggested* that the benefits would exceed the costs…." [Doc.# 162-28, p.4 (emphasis added)]. Omitting that introductory phrase makes a big difference in terms of any Rule 26 witness relying on the single page (page 124) of this newly cited document as proof of feasibility. A "suggestion" or "estimate" is not evidence upon which an "expert" can testify that side guards are feasible, either in general or with respect to any specific a "telescoping" guards.

The 2013 UMTRI paper cited in Footnote 8 goes no further than to offer "preliminary estimates," based on "only a limited sample" of serious crashes, and "preliminary results" that "point to opportunities" to "address the damage from … side impact crashes in some ways" *if* the closing speeds "are low enough…." [Doc.#162-31, p.10]. Again, this hearsay document only speaks of *possibilities*. It does not propose or analyze any side guard design, and it does not conclude that any design is feasible. To the contrary, it finds that side impact crashes present "a significantly more complex problem that rear underride," and the wide range of possible impact speeds and angles "all present radically different problems." [*Id.* at 84, Doc.# 162-31].

The 2012 Brumbelow paper cited in Footnote 10 is likewise inaccurately represented as having determined that one of the specific (non-telescoping) side guard designs fabricated by the plaintiffs' experts "would" reduce the risk of injury in side impacts. [Doc.# 162, pp.5-6]. In actuality, the paper concludes only that that side guards "*could*" reduce the injury severity, but "[i]n reality, … it would be difficult to achieve the full reduction for several reasons." [Doc.#162-29, p.6 (emphasis added)]. These reasons include: (1) the need to cover areas left open by sliding tandem axles, or else require that all axles be permanently fixed; (2) the need to assess "the practical implications" of converting the entire U. S. trailer fleet to incorporate structures strong enough to withstand perpendicular impacts with minimal relative displacement, and yet still provide the potential benefits, which was expressly "beyond the scope of the current study;" (3) the fact that side guards

would not transform every crash into a low severity event, and some occupants could still sustain other injuries due to lack of restraint use, high deceleration levels or other factors; and, (4) the fact that side guards could create more "glance-off" crashes and serious injury could still occur. [Doc.# 162-29, pp.6-7]. This is hardly evidence that a Rule 26 witness can rely upon to prove the existence of a feasible guard design, much less "telescoping" design. At most, the Brumbelow paper speaks, more than a decade after the trailer at issue in this case was manufactured, of a still unproven, mere possibility that some benefits may be achieved, but first "technical challenges such as the strength and positioning of guards must be overcome." [*Id. at* p. 599, Doc.# 162-29, p.8]. It does *not* state that one of the plaintiffs' experts' designs "would" reduce the risk of serious injury in 75% of serious impacts, as plaintiffs have represented. [Doc. #162, pp.5-6].

Nor does the (newly produced) 2013 NTSB Power Point document cited in Footnote 11 prove the feasibility of any side guard design. The selected pages of this document attached to plaintiffs' response address underride collisions into *single-unit trucks*, and there is no reference to a "telescoping" guard on trailers of the type at issue in this case.

As seen from this review of the "evidence" submitted in response to Great Dane's motion for summary judgment, plaintiffs have no admissible, reliable basis for any Rule 26 witness to opine that an economically feasible "telescoping" side guard existed in 1998. At most, plaintiffs have only suggestions of "potential"

benefits and preliminary or "rough estimates" of the cost[4] of hypothetical guards of a type that would not even have covered the area in front of the trailer wheels where the Wilden collision occurred. This is the full extent of the source authorities for economic feasibility cited in plaintiffs' response to Great Dane's motion for summary judgment, and they fail to provide a reliable basis or utilize a reliable methodology upon which any of the plaintiffs' experts may opine that "telescoping" side guards are feasible.

**C. Technological feasibility.**

Plaintiffs expend much effort attempting to show what Great Dane "knew" about the dangers of side underride before 1998 and what Great Dane purportedly was "told" about incorporating side guards into trailer designs before 1998. [Doc.# 162, pp.10-12]. Plaintiffs also characterize Great Dane's decision not to design, build or test side guard prototypes, and its agreement with NHTSA's determination that side guards were not cost-justified, as amounting to having "done nothing." [Doc.# 162, p.12]. Great Dane need not address the stark inaccuracy of those arguments here, for they are irrelevant to the motion for summary judgment. Proving what Great Dane knew or did not know, or what it did or did not do with that knowledge, is not an element of an enhanced injury claim under Kentucky law. Instead, again, it is the plaintiffs' burden to prove a defect in the Great Dane trailer and the existence in 1998 of a safer alternative design for that trailer (and for every other van trailer on the nation's highways) that would have produced a different

---

[4] Plaintiffs' sources for the "cost" of side guards cited in Footnote 12 will be addressed in Great Dane's Reply Brief in Support of its Motion to Exclude Opinion Testimony by Perry Ponder and Bruce Enz.

outcome in the plaintiffs' accident and a net benefit when all side-impact accidents are considered. Great Dane's knowledge or alleged inaction is simply not an element of this claim.

Nonetheless, if the documents cited in this section of plaintiffs' response are intended to show that the technological challenges of designing side guards had somehow been solved before 1998, then the citations deserve a closer look, for in fact they do not and they therefore cannot support the testimony of plaintiffs' Rule 26 witnesses. For example, the 1968 ARA Report did not, as plaintiffs assert, contain "detailed engineering drawings" for a side guard; and, if that report contained a "blue print" for what should have been installed on trailers [Doc. #162, p.11, n.26], then it is remarkable that the federal government (which paid for the report) did not immediately require the installation of side guards. To the contrary, the government most likely did not impose this requirement because the ARA study prefaced its conclusion with the express qualification that "an insufficient amount of technical data was obtained during this period to develop standards…." [Doc.162-16, p.14]. As for any "detailed engineering drawings," the ARA report characterized its design concept as "preliminary" and in need of an "experimental program" to verify its structural and dynamic analysis. [*Id.*]. The design, which allows for some form of compressible, energy-absorbing attenuating struts extending from side to side underneath the trailer, from one side guard to the other, has never been built and tested.[5] More importantly for this case, the ARA guard concept did not cover

[5] NHTSA did indicate in 1969 that "technical studies" would be completed before it required underride protection on the sides of trailers [Doc.# 162-17, p.2], but it never reported the results of

the entire trailer side, but rather allowed for the trailer tandem axles to slide rearward and forward (as shown in the forward position in the report). [Doc.# 162-16, pp.34-35]. If this "blue print" had been followed by Great Dane in 1998, it would have made no difference in the plaintiffs' accident because the area in front of the trailer axles where the Wilden Lumina collided with the trailer would not have been covered by this guard.[6]

The 1977 Page Patent guard design [Doc.# 162, p.14] similarly would not have covered the gap in front of the sliding tandem axles or else it would not have allowed for tandem axles to slide. The "sliding concept" described in that patent was to allow the trailer owner to raise or lower the height of the horizontal guard rail by manually unbolting and re-bolting sections of the vertical braces. No similar repositioning is mentioned in the patent for extending the horizontal guard rail to cover the gap created if the trailer axles were moved rearward. No specifications are provided for strength or energy absorption in the Page guard design, and plaintiffs have produced no evidence that any guard of this type was ever even built

---

any such studies. Plaintiffs' representation that the following year NHTSA expressed a "desire" that trailer manufacturers would "on their own" include side guards in their trailer designs [Doc.#162, pp.11-12], is not accurate. In 1970, NHTSA did again mention the pending technical studies that could lead to the inclusion of "energy management" in guards on the sides of trailers, but no side guards were proposed at that time. Instead, the 1970 publication only proposed a standard for *rear* underride protection. That rear standard contained a 50,000-pound strength requirement but no energy absorption requirement. Referring to that rear guard proposal, NHTSA went on to state that it "does not preclude the immediate use of energy absorbing elements in *the protected areas* [i.e., the *rear* of the trailer], and it is hoped that manufacturers will include these elements in their designs." [Doc.# 162-18, p.2 (emphasis added)]. This statement in no way expressed a "desire" by NHTSA that manufacturers would start installing guards on the *sides* of trailers.

[6] The 1991 NTSB report cited in plaintiffs' response [Doc. #162, p.12] is even less relevant as evidence of the technological feasibility of side guards on trailers. It deals with a bus-striking-car accident that did not involve a truck-trailer at all. [Doc. #162-19]. Plaintiffs' citation to the 1975 IIHS document [Doc. #162, p.12, n.31] is equally unavailing. The two pages attached as Exhibit "N" to plaintiffs' response do not contain the statement quoted in Footnote 31, and in any event there is no indication that the full document contains any information that proves the existence in 1998 of a feasible side guard design.

or installed on a trailer, or whether it would have provided any degree of mitigation against underride in a collision of any type. Moreover, the court should note that in 1979, NHTSA expressly rejected Mr. Page's petition requesting NHTSA require installation of his guard design on all trailers. *See* 44 Fed. Reg. 55077 (Sept. 24, 1979). Even more important, however, is the fact that, again, this guard concept did not cover the area underneath the trailer where the plaintiffs' collision occurred. As with the D'Orazio guard and all previous guards by Ponder and Enz, the Wilden Lumina would not have made contact with any part of the Page guard designs.

Plaintiffs' citation to a 1984 UK Patent Application (2 142 595 A) at Footnote 42 of their response, is disingenuous. This is a lightweight guard design that is intended "to prevent pedestrians, cyclists, motorcyclists, animals and other obstacles passing beneath the vehicle and being run over by the rear wheels." [Doc.#162-23, p.5]. There is no mention of preventing passenger vehicle underride in this application. The guard is intended only to meet the strength requirement established by legislation in the United Kingdom (2kN, or just 450 pounds), and the telescoping aspect of this guard design does not operate to allow for coverage under the side of the trailer as tandem axles are repositioned in daily use. Instead, the sliding feature enables the installer to fit the guards permanently to the trailers of varying length and to cover the required areas if a trailer is manufactured with *two* fixed axles or if a *third* fixed axle is added. [*Id.*] The trailer manufacturer could buy this guard from a supplier, and the guard would "slide" to fit whatever length was needed along the side of the trailer and then be bolted or welded on

permanently. It would not slide during daily operation. Another benefit of the sliding feature was that the guard could be compressed for shipping in "kit" form. [*Id.*] Clearly, this was not a "telescoping" side guard for passenger vehicle impacts that would have covered the side of the Great Dane trailer where the plaintiffs' collision occurred.

Ironically, the 1984 UK patent is the *only* "telescoping" side guard concept that existed before 1998. All of the other concepts cited in the plaintiffs' response first arose after the subject Great Dane trailer was manufactured. The telescoping design from Strick Trailer did not exist until 2001, and plaintiffs and their experts have no evidence that this guard concept was ever built, tested, or made available to any trailer purchaser. Plaintiffs cite Mr. Enz's "own patent application" for a side underride guard that included a "telescoping extension" [Doc. #162, p.14], but Enz did not prepare this patent application, and he did not design the telescoping component. That work was done by the lawyer who filed the patent application. At his deposition, Enz did not even recall that the application contained a telescoping section. [Doc. #162-13 pp. 50-52, Dep. pp. 197-202]. And he conceded that the patent did not contain a final design drawing and did not specify material types, dimensions, or methods of attachment. [*Id.* pp. 52-53]. Thus, even when the application was filed in 2006, it did not provide enough information to be built.

Similarly, Ponder's so-called "non-litigation design" promoted as "Angel Wings" [Doc. #162, p.14] has also not been built, tested, or costed out for a trailer purchaser. Ponder's Rule 26 report did not even mention Angel Wings as a feasible

alternative design for the 1998 trailer at issue in this lawsuit. As of the date of his deposition, Ponder had not added an expanding or telescoping feature to his Angel Wing concept. [Doc. #162-9, p.7, Dep. 27]. Plaintiffs should not be allowed to cite this undisclosed design as evidence of a technologically feasible "telescoping" guard.

The new "telescoping" guard design that Ponder did produce as Exhibit "B" to his Rule 26 report is separately addressed in Great Dane's motion to exclude Ponder's opinion testimony, where citations to Ponder's deposition establish that this concept also has not been built, tested, costed out by component part, or quoted to any trailer purchaser to date, much less back in 1998. Ponder has testified for over a decade on trailer side guard designs, and yet even he did not propose this "telescoping" concept until the present lawsuit created a need for it. In essence, plaintiffs seek to have Ponder testify here that the "concept" for a telescoping guard existed in 1998 and Great Dane should then have developed such a guard, even though Ponder himself has failed to do this despite having been paid by litigants on numerous occasions over the past 10 years to generate alternative designs for trailer side guards. This fact alone belies his opinion that Great Dane should have installed such a guard in 1998.

Plaintiffs claim that they "have tested" the telescoping guard concept [Doc. #162, p.17], but it is undisputed that they have performed no static load test or dynamic crash test into any such guard, because they have built none. Their so-called "testing" has been in the form of finite element analysis. [*Id.*] As shown in Great Dane's reply brief in support of its motion to exclude opinion testimony by

Ponder, this analysis did not apply theoretical loads on the "telescoping" component in the direction and manner that would have occurred in plaintiffs' accident. It therefore does not prove the feasibility of the guard design or any alternative outcome if this guard design had been on the Great Dane trailer when the accident occurred.

## CONCLUSION

Plaintiffs have attached several inches of materials to their response to Great Dane's motion for summary judgment, but these materials do not prove that in 1998, when the Great Dane trailer was manufactured, a safer alternative trailer design existed that would have prevented the plaintiffs' injuries in the circumstances of this case, where the Wilden Lumina struck the trailer's leading axle and proceeded under the trailer in an area not guarded by any prototype guard design previously proposed, built or tested by any of plaintiffs' experts. The "telescoping" guard concepts developed for this lawsuit have not been built or tested, nor have any calculations, finite element analysis, or other form of analysis been undertaken to determine the load-bearing ability of such a guard when loaded in the direction that occurred in the plaintiffs' accident. The load-bearing capability and energy absorbing characteristics of such a guard under those circumstances are completely unknown, as is the ability of such a guard to resist folding or collapsing at the end of the "telescoping" bar. No reliable scientific methodology was utilized that would support an expert opinion that passenger compartment intrusion would not have occurred in this hypothetical accident or any other hypothetical accident into the side of a trailer equipped with one of plaintiffs' "telescoping" guards.

Therefore, totally apart from any differences between the parties' respective experts on issues of accident reconstruction, the essential finding needed to support a recovery on plaintiffs' enhanced injury claim (that a hypothetical telescoping guard would have prevented the trailer from intruding into the passenger compartment) cannot be proven in this case. The plaintiffs' Rule 26 witnesses have failed to provide a reliable basis to support opinion testimony that "telescoping" side guards would produce a net benefit in the Wilden accident or when all of the possible types of side collisions are considered, including collisions involving unbelted occupants and many the other types of collisions that would result from the displacement of cargo and addition of more trucks on the nation's highways if side guards were required on all trailers. Without this evidence, plaintiffs cannot prove the existence of a practical alternative trailer design that is both economically and technologically feasible and that would have produced a different outcome in the plaintiffs' accident.

For these reasons, Great Dane submits that its motion for summary judgment should be granted.

/s/ *John L . Tate*
John L Tate
jtate@stites.com
Marjorie A. Farris
mfarris@stites.com
STITES & HARBISON PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400

Glen M. Darbyshire
gdarbyshire@bouhan.com
Bouhan Falligant, LLP
447 Bull Street
Savannah, Georgia 31401
Telephone: (912) 232-7000

*COUNSEL FOR DEFENDANT, GREAT DANE LIMITED PARTNERSHIP AKA GREAT DANE TRAILERS, LIMITED PARTNERSHIP AKA GREAT DANE TRAILERS, INC.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed and served via CM/ECF this 29th day of March, 2016, to the below named counsel for plaintiffs:

Paul F. Ferguson, Jr.
Ferguson Law Firm
Edison Plaza
350 Pine Street, Suite 1440
Beaumont, Texas 77701
cferguson@thefergusonlawfirm.com
*Counsel for Plaintiffs*

Ronald P. Hillerich
1800 Kentucky Home Life Bldg.
239 S. Fifth
Louisville, KY 40202
ron@hillerichlaw.com
*Counsel for Plaintiffs*

Allen K. Gruner
300 W. Liberty, Suite Three
Louisville, KY 40202
akglaw@bellsouth.net
*Counsel for Plaintiffs*

*/s/John L. Tate*
*Counsel for Great Dane Limited Partnership*

1079439:1:LOUISVILLE